IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| UNION SPRINGS TELEPHONE COMPANY, INC., an Alabama corporation,<br><br>    Plaintiff,<br><br>v.<br><br>T-MOBILE USA, INC., a Delaware corporation doing business in Alabama; Defendants A, B, C and/or D, both singular and plural, being those persons, firms, partnerships, corporations or other entities who held an interest in, or operated, T-Mobile USA, Inc.; all whose names are unknown at this time but will be substituted by amendment when ascertained,<br><br>    Defendants. | )<br>)<br>)<br>)<br>)<br>)  **Case No.: 2:06-CV-0474-MEF**<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## MEMORANDUM BRIEF IN SUPPORT OF MOTION TO REMAND AND IN OPPOSITION TO DEFENDANT'S NOTICE OF REMOVAL

COMES NOW Plaintiff Union Springs Telephone Company, Inc. ("Union Springs"), by and through its undersigned counsel, and files this Memorandum Brief in Support of Union Springs' Motion to Remand and Opposition to T-Mobile USA, Inc.'s ("T-Mobile") Notice of Removal. Union Springs' state law claims do not permit removal of this action to federal court under the doctrine of complete preemption, nor does T-Mobile's defense of preemption support removal based upon federal question jurisdiction. This Court must, therefore, remand this action to the Bullock County Circuit Court of Alabama.

### Relevant Facts

Union Springs is an incumbent local exchange carrier ("ILEC") that provides

local telephone service to portions of Bullock County. As such, it is a "transportation company" under Alabama law. ALA. CODE § 37-2-1 (1975 as amended) ("The term 'transportation company' shall mean and include every person not engaged solely in interstate commerce or business that now or may hereafter own, operate, lease, manage or control, as common carriers or for hire...any telephone line") (emphasis added). Transportation companies are public utilities regulated by the Alabama Public Service Commission ("APSC"). ALA. CODE §§ 37-1-30, -31, 37-2-1 and -3 (1975 as amended). Among other things, the APSC requires Union Springs to file tariffs that govern the terms and conditions under which it provides communication services to another person or entity. Union Springs is prohibited from changing rates and other matters covered by the tariffs without following the procedures set forth by the APSC. *See* copy of APSC Telephone Rule T-12, attached hereto as Exhibit "A". *See also* ALA. CODE §§ 37-2-10, -12 and -13 (1975 as amended). After a tariff is submitted to the APSC and approved, it becomes the governing source of authority between the utility company and its existing and future customers in regard to such specified services. *Id.*

T-Mobile is a commercial mobile radio services ("CMRS") provider. In 2005, Union Springs and T-Mobile participated in APSC proceedings addressing the compensation due Union Springs and other Alabama incumbent local exchange carriers ("ILECs") for the termination of T-Mobile traffic on their telephone networks. Union Springs' Complaint seeks to enforce this Order and collect payments "for all T-Mobile indirect, intraMTA mobile-to-land traffic terminated by the ILECs from the date of T-Mobile's meet point billing conversion with BellSouth through April 29, 2005", based on the ILECs' APSC approved tariffs. Complaint at ¶¶ 6, 7; Order of the APSC at p. 4, *In*

2

*re: Request for a Declaratory Ruling Upholding the Applicability of Tariff Provisions Governing Compensation for Indirect CMRS Traffic*, Docket 28988 (APSC Feb. 24, 2006), attached hereto as Exhibit "B". Union Springs' Complaint does not assert a federal cause of action.

Addressing its authority to order T-Mobile to compensate the ILECs pursuant to the rates set out in the ILECs' state tariffs, the APSC noted that, "in response to a petition by T-Mobile, the FCC had recently upheld the right of ILECs to apply state tariffs to terminating wireless traffic for charges accruing prior to April 30, 2005." Ex. "B" at p. 4, citing *In the Matter of Developing a Unified Intercarrier Compensation Regime; T-Mobile, et al., Petition for Declaratory Ruling Regarding Incumbent LEC Wireless Termination Tariffs;* Declaratory Ruling and Report and Order, 2005 WL 433200, 20 FCC Rcd. 4855 (Feb. 24, 2005) (the "FCC Order"). T-Mobile failed to appeal from the APSC's February 24, 2006 Order and did not seek to otherwise challenge the Order in state or federal court. ALA. CODE §§ 37-1-120, -122 (1975 as amended).

## Argument

### Union Springs' Claims Are Not Preempted By Federal Law Under The Well-Pleaded Complaint Rule Or Its Exceptions.

In a removal action, federal question jurisdiction must be ascertained on the face of plaintiff's well-pleaded complaint (the "well-pleaded complaint rule"). *City of Rome v. Verizon Communications, Inc.*, 362 F.3d 168, 174 (2nd Cir. 2004). A federal claim may only be removed based on federal question jurisdiction when the plaintiff's statement of his own cause of action "'shows that it is based' on federal law". *BLAB T.V. of Mobile, Inc. v. Comcast Cable Communications, Inc.*, 182 F.3d 851, 854 (11th Cir. 1999), citing *Louisville & Nashville R.R. v. Mottley*, 211 U.S. 149, 152 (1908). Stated another way,

the plaintiff is the "master of the claim" and may preclude removal based on federal question jurisdiction by making an affirmative choice not to plead any available federal claim. *BLAB T.V.*, 182 F.3d at 854. In a removal action, the Court is "required to resolve all doubts about federal jurisdiction in favor of remand." *See In re Business Men's Assurance Co. of America*, 992 F.2d 181, 183 (8th Cir.1993).

Union Springs' state law claims, seeking amounts owed under a final APSC Order for which no appeal was filed, neither assert a federal law claim, nor are they premised on federal law. They are not, therefore, "completely preempted" by federal law so as to invoke an exception to the well-pleaded complaint rule. *BLAB T.V.*, 182 F.3d at 854, citing *McClelland v. Gronwaldt*, 155 F.3d 507, 512 (5th Cir. 1998). The Telecommunications Act of 1996 (the "Act") has neither preempted any common law or state statutory rule, nor does the Act in this instance provide an exclusive cause of action. *See City of Rome*, 362 F.3d at 176-77. These obligations are governed by 47 U.S.C. § 251(d)(3), which provides:

> In prescribing and enforcing regulations to implement the requirements of this section, the [Federal Communications] Commission shall not preclude the enforcement of any regulation, order, or policy of a State commission that--(A) establishes access and interconnection obligations of local exchange carriers; (B) is consistent with the requirements of this section; and (C) does not substantially prevent implementation of the requirements of this section and the purposes of this part.

Such provision expressly reserves power to the states in the regulation of carriers engaged in the provisioning of telephone service and negates T-Mobile's contention that Congress has intended "'to occupy the entire field of regulation'" (*Capital Cities Cable v. Crisp*, 467 U.S. 691, 699 (1984)) or that "the comprehensive nature of federal regulation of the communications industry dictates that the plaintiff's claims may be found to arise

under federal common law." Defendant's Notice of Removal at ¶ 6.

T-Mobile has made, and lost, its preemption argument once before at the Federal Communications Commission ("FCC"), which is the federal agency with primary responsibility for applying and interpreting the Act. In its petition which prompted the FCC Order, T-Mobile claimed that the application of state tariffs (filed and approved under state law) in instances such as this was preempted by, or impermissibly interfered with, the Act. The FCC framed the issue as follows:

> On September 6, 2002, T-Mobile USA, Inc., Western Wireless Corporation, Nextel Communications and Nextel Partners jointly filed a petition for declaratory ruling, which the Commission incorporated into this proceeding. *The petitioners and other CMRS providers claim that, by filing these tariffs, the incumbent LECs are acting in bad faith by attempting to preempt the negotiation process contemplated by the Act and the Commission's rules.* The incumbent LECs respond that, in the absence of an agreement or other arrangement, wireless termination tariffs are the only mechanism by which they can obtain compensation for terminating this traffic. They claim that they are provided no meaningful opportunity to bargain and no technical ability to stop the flow of this incoming traffic. Further, they emphasize that the establishment of these tariffs in no way precludes CMRS providers from exercising their right to pursue interconnection with them under the Act, and that such tariffs apply only in the absence of an agreement or other arrangement.

*In the Matter of Developing a Unified Intercarrier Compensation Regime*, 2005 WL 433200 at *3 (emphasis added; footnotes omitted).

The FCC then found that the enforcement by a state regulatory commission of state tariffs in cases such as this did not contravene federal law or regulations, nor was it preempted by prior FCC rulings applying the Act:

> By routing traffic to LECs in the absence of a request to establish reciprocal or mutual compensation, CMRS providers accept the terms of otherwise applicable state tariffs. These tariffs do not prevent CMRS providers from requesting reciprocal or mutual compensation at the rates required by the Commission's rules. Accordingly, wireless termination tariffs do not violate a CMRS provider's rights to reciprocal or mutual

compensation under section 251(b)(5) and section 20.11 of the Commission's rules.

*Id.* at *4 (footnotes omitted).

As to eliminate any doubt about the merits of T-Mobile's total preemption claim, the FCC affirmed that the type of claim filed at the APSC, and sought to be enforced in state court, was not governed by the Act and was thus beyond its jurisdiction:

> FN40. Although a tariffed arrangement would not be unlawful per se under the current rules, we make no findings regarding specific obligations of any customer of any carrier to pay any tariffed charges. A complaint requesting that we make such findings would not state a cause of action for which the Commission can grant relief. See Illinois Bell Tel. Co. v. AT&T, File Nos. E-89-41 through E-89-61, Order, 4 FCC Rcd 5268, 5270, para. 18 ("The complaints do not allege that AT&T, in its role as a carrier, acted or failed to act in contravention of the Communications Act ... Rather, they allege conditionally that AT&T may have failed to pay the lawful charge for service. Such allegations do not state a cause of action under the complaint procedures and are properly dismissed."), recon. denied, 4 FCC Rcd 7759 at 7760, ¶ 4 (1989) ("BOCs may not bring a complaint against AT&T in its capacity as a customer.").

*Id.* at *7.

In summary, the APSC's Order applies Union Springs' state tariff to the interconnection and termination of T-Mobile's wireless traffic in a manner in which the FCC has affirmed is neither preempted by, nor in conflict with, federal law. Ex. "B" at p. 4.

The United States Supreme Court has acknowledged a Congressional intent for complete preemption in only two statutes - the Labor Management Relations Act of 1947 and the Employee Retirement Income Security Act of 1974 ("ERISA"). *City of Rome*, 362 F.3d at 177. Thus, federal law does not create the cause of Union Springs' action, nor is federal law an essential element of Union Springs' state law claim. The claim can not, therefore, "arise under" federal law, and this Court has no jurisdiction over Union

Springs' action. *See Pacheco de Perez v. AT & T Co.*, 139 F.3d 1368, 1373 (11th Cir. 1998).

Anticipated or inevitable federal defenses also do not generally support removal based upon federal question jurisdiction. 28 U.S.C.A. §§ 1331, 1441(b). *See Pacheco de Perez,* 139 F.3d at 1373; *BLAB T.V.*, 182 F.3d at 854. Removal jurisdiction is to be strictly construed, and any doubts regarding the existence of federal jurisdiction are to be resolved in favor of remand. *Pacheco de Perez,* 139 F.3d at 1373; *Siler v. Morgan Motor Co., et al.*, 15 F. Supp. 468, 472 (E.D. Ky. 1936), citing *Breymann v. Pennsylvania, O. & D.R. Co.*, 38 F.2d 209, 212 (6th Cir. 1930).

WHEREFORE, PREMISES CONSIDERED, Plaintiff Union Springs Telephone Company, Inc. respectfully requests that this Honorable Court grant Plaintiff's Motion for Remand to Bullock County Circuit Court for the State of Alabama on the grounds that Union Springs' state law claims do not give rise to federal jurisdiction or support the removal of this action to federal court.

Respectfully submitted on this 26th day of June, 2006.

s/Mark D. Wilkerson
MARK D. WILKERSON (WIL072)
AMANDA C. CARTER (CAR116)
DANA H. BILLINGSLEY (BIL02)
Attorneys for Plaintiff Union Springs
Telephone Company, Inc.
WILKERSON & BRYAN, P.C.
405 South Hull Street
Montgomery, AL 36104
Telephone: (334) 265-1500
Facsimile: (334) 265-0319
E-mail: mark@wilkersonbryan.com
E-mail: amanda@wilkersonbryan.com
E-mail: dana@wilkersonbryan.com

OF COUNSEL:

WILKERSON & BRYAN, P.C.
405 South Hull Street
Montgomery, AL 36104
Telephone:  (334) 265-1500
Facsimile:  (334) 265-0319
mark@wilkersonbryan.com
amanda@wilkersonbryan.com
dana@wilkersonbryan.com

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the foregoing on all counsel of record as listed below by placing a copy thereof in the United States mail, postage prepaid, on this the 26th day of June, 2006:

Peter S. Fruin, Esq.
Joshua D. Jones, Esq.
MAYNARD, COOPER & GALE, P.C.
1901 Sixth Avenue North
2400 AmSouth/Harvert Plaza
Birmingham, Alabama 35203-2602

s/Mark D. Wilkerson
MARK D. WILKERSON (WIL072)
AMANDA C. CARTER (CAR116)
DANA H. BILLINGSLEY (BIL02)
Attorneys for Plaintiff Union Springs
Telephone Company, Inc.
WILKERSON & BRYAN, P.C.
405 South Hull Street
Montgomery, AL 36104
Telephone:  (334) 265-1500
Facsimile:  (334) 265-0319
E-mail: mark@wilkersonbryan.com
E-mail: amanda@wilkersonbryan.com
E-mail: dana@wilkersonbryan.com

EXHIBIT "A"

communication that their communication is being monitored; or

(c) By clearly marking each instrument from which communications may be recorded without notice.

# RULE T-12

## Filing Of Telephone Tariffs

(A) Tariffs

(1) Each telephone utility shall have its tariff on file with the Commission and said tariff shall (a) be in accordance with the rules and regulations governing the filing of tariffs as prescribed by the Commission, and (b) state the rates, charges, classifications, and subscriber rules and regulations which govern provision of telecommunications service.

(2) Any public utility engaged in furnishing telephone service which determines to furnish service to its employees, pensioners, officers, or other persons or organizations at no charge or at charges less than those prescribed in its published schedules or tariffs, shall file tariffs with the Commission as hereinafter prescribed stating the conditions and circumstances under which such services will be furnished.

(3) The telephone utility shall file tariffs in the standardized format approved by this Commission. A company who prefers a company-specific format shall petition the Commission for approval of any format other than the standardized version.

(4) A telephone utility shall not charge, demand, collect or receive a greater or lesser or different compensation for regulated telecommunications service than the rates,

25

fares and charges specified in the tariffs in effect at the time, except where a special service contract has been filed and approved by order of the Commission, and except where otherwise authorized by a vote of the Commission.

(B)   Requirements As to Size, Form, identification and Filing of Tariffs

   (1)   All tariffs shall be in loose-leaf form of size eight and one-half inches by eleven inches and shall be of letter-quality print on paper of good quality.

   (2)   Each Local Exchange Carrier in Alabama shall have on file with the Alabama Public Service Commission, current Alabama General Highway County maps of scale one-half (1/2) inch or one (1) inch equals one mile, showing utility, and exchange boundary lines.

      (a)   Where possible, utility boundary lines adjoining another local exchange carrier shall be located by appropriate measurement to an identifiable location where that portion of the boundary line is not otherwise located on section lines, waterways, railroads, etc.

   (3)   A margin of not less than three-fourths inch without any printing thereon shall be allowed at the binding edge of each tariff sheet.

   (4)   Tariff sheets are to be numbered consecutively by section, sheet and revision number. Each sheet shall show an issue date and requested effective date, a revision number, section number, sheet number, name of the Utility and the name of the tariff and title of the section in a consistent manner.

   (5)   When it is desired to make changes in the rates, rules, maps, or other provisions of the tariff, an official

tariff filing consisting of an original and ten (10) copies shall be made to the Commission addressed as follows:

Secretary
Alabama Public Service Commission
P. O. Box 304260
Montgomery, Alabama 36130

(C)  Transmittal Letters

Each tariff filing shall include a letter of transmittal accompanied by ten (10) copies. All explanations shall be made in such form as to be readily understood by persons not fully familiar with technical language. Each transmittal letter shall include:

(1)  A list of sheets filed by section, sheet and revision.

(2)  A narrative describing the type of filing (new service, change of regulation, rate increase, rate reduction, etc.)

(3)  A full explanation of each change, new offering, new regulation, etc., and details of operations of each new service.

(4)  A full explanation of the impact of each proposed change on existing subscribers.

(5)  A revenue impact statement giving the estimated revenue that a new service will produce over a one (1) year period, explaining how the estimate was obtained.

(6)  Each tariff filing shall be treated as an original in that all required information shall be submitted with each filing regardless if similar or identical

27

information such as cost study data or technical data has been submitted with previous filings.

(7)  Unrelated new service offerings shall not be included in the same tariff filing. Neither shall unrelated tariff changes be included in the same tariff filing.

(8)  Technical explanations, marketing data or other information necessary to describe the proposed additions or changes shall be included as a part of the tariff filing.

(D)  Cost Study Data

(1)  Appropriate cost data shall be submitted as may be required by the Commission staff for each new or changed rate by any telephone utility.  If full cost data is requested by the Commission staff, but is not available, explanation should be given including the available data, the reason full data is not available, and on what information the proposed rates are based.  Supporting data and/or explanation of how dollar amounts appearing on cost studies were obtained shall be included.

(2)  Cost data developing recurring and non-recurring charges such as connecting and reconnecting service will be included. Each tariff item will be listed by description and payment plan. The following specific cost data will be furnished as a minimum: (a) investment: material, labor, and engineering expenditures; (b) annual operating cost: maintenance and shop repair, administrative expenses, ad valorem taxes, and other costs; (c) capital cost: depreciation, cost of money, income tax, and other costs; and (d) non-recurring costs based on a monthly equivalent.

(3)  Requested rate increases may be filed in accordance with the Minimum Filing Requirements adopted by the Commission.

28

(4) Any cost data obtained by the Commission shall be treated as proprietary. Copies may be obtained by other parties only from the company preparing the data, and the data shall be supplied by that company upon entry of a mutually acceptable proprietary agreement.

(E) Notice of Change; Special Permission; Symbols

(1) Each tariff filing shall include new or revised tariff sheets (10 copies) with notifications in the right-hand margin indicating each change made on these sheets. Notations to be used are:

(C) to signify change in regulation;
(D) to signify a deletion;
(I) to signify a rate increase;
(L) to signify material relocated in the tariff;
(N) to signify a new rate or regulation;
(R) to signify a rate reduction;
(T) to signify a change in text, but no change in rate or regulation.

Sheets issued under new numbers are to be designated as original sheets. Sheets being revised should show the next number of revision from the existing sheet.

(2) Any tariff filings to make changes of existing maps shall include location maps so marked with the proposed changes indicated in red pencil in lieu of the right-hand margin notation specified in the preceding paragraph.

(3) All tariff filings shall be received at the Commission offices at least thirty (30) days before the date upon which they are to become effective, except those tariff filings made in response or pursuant to a Commission order.

(F) Commission-Ordered Tariff Filings

29

Tariff filings made in response to an order issued by the Commission shall include a transmittal letter stating that the tariffs attached are in compliance with the order, giving the docket number, date of the order, a list of tariff sheets filed and any other information necessary. The transmittal letter shall be exempt from all other requirements of T-12(C). The tariff sheets shall comply with T-12(B) and shall include all changes ordered and absolutely no others. The effective date and/or wording of said tariffs shall comply with the ordering provisions.

(G)   Compliance

Any tariff filed with the Commission and found to be noncompliant with T - 12 shall be so marked and one copy shall be returned to the filing utility with a brief explanation advising in what way the tariff does not comply and advise that the Commission does not consider said filing in compliance with T-12. Full compliance with this rule shall not guarantee Commission approval or preclude requests for additional information or clarification.

# RULE T-13

## Transfers and Acquisitions

(A)(1)   The telephone utility shall notify the Commission prior to the sale or transfer of any telephone system, in whole or in part of such system.

(2)   This rules does not apply to the sale or transfer of any equipment or material not in actual service, nor to the purchase or sale by a telephone utility of service lines

30

# EXHIBIT "B"

# STATE OF ALABAMA
### ALABAMA PUBLIC SERVICE COMMISSION
### P.O. BOX 304260
### MONTGOMERY, ALABAMA 36130-4260

JIM SULLIVAN, PRESIDENT

JAN COOK, ASSOCIATE COMMISSIONER

GEORGE C. WALLACE, JR., ASSOCIATE COMMISSIONER

WALTER L. THOMAS, JR.

SECRETARY

| | |
|---|---|
| **PETITION FOR DECLARATORY RULING BY ALABAMA'S RURAL INCUMBENT LOCAL EXCHANGE CARRIERS** | **In re: Request for a Declaratory Ruling upholding the applicability of tariff provisions governing compensation for indirect CMRS traffic.** |

### DOCKET 28988

### ORDER GRANTING MOTION TO LIFT STAY
### WITH REGARD TO T-MOBILE USA, INC.

**BY THE COMMISSION:**

## I.    INTRODUCTION AND BACKGROUND

In response to the Joint Petition of numerous Alabama Rural Incumbent Local Exchange Carriers ("ILECs"),[1] the Commission established this declaratory proceeding to consider the issue of whether certain tariff provisions implemented by the petitioning ILECs could be applied to indirect commercial mobile radio service ("CMRS") traffic terminated to those ILECs in the absence of a superseding agreement governing compensation for such traffic. Said proceeding was open to all interested parties who desired to participate.

On July 31, 2003, the Commission entered an order seeking comments from interested parties regarding the enforceability of the ILEC tariff provisions in question with respect to indirect CMRS traffic. The Commission received and considered initial comments from the ILECs, BellSouth Telecommunications, Inc. ("BellSouth"); AT&T Communications of the South

---

[1] Ardmore Telephone Company, Inc.; Blountsville Telephone Company; Brindlee Mountain Telephone Company; Castleberry Telephone Company, Inc.; Farmers Telephone Cooperative, Inc.; GTC, Inc., d/b/a GT Com; Graceba Total Communications, Inc.; Hayneville Telephone Company, Inc.; Hopper Telecommunications Co., Inc.; Interstate Telephone Company; Millry Telephone Company, Inc.; Mon-Cre Telephone Cooperative, Inc.; Moundville Telephone Company, Inc.; National Telephone of Alabama, Inc.; New Hope Telephone Cooperative, Inc.; Otelco Telephone, LLC. (formerly Oneonta Telephone Company, Inc.).; Pine Belt Telephone Company, Inc.; Ragland Telephone

DOCKET 28988 - #2

Central States, LLC ("AT&T"); and a group of CMRS providers (the "CMRS Carriers").[2] Reply comments were received from the ILECs and the aforementioned CMRS carriers. Following consideration of the Initial and Reply Comments, the Commission scheduled the issues presented for oral argument on December 2, 2003.

Following the oral arguments of December 2, 2003, the Commission considered the entire record compiled and entered an Order on January 26, 2004, upholding the applicability of the ILEC tariff provisions under review to indirect CMRS traffic terminated to the ILECs (the "Declaratory Order").[3]

Prior to the effective date of the Declaratory Order, the ILECs and the participating CMRS Carriers (the "Settlement Parties") informed the Commission that they had reached a settlement wherein each participating CMRS Carrier agreed to enter into a comprehensive Traffic Termination Agreement with each participating ILEC except in those instances in which the Settlement Parties had already entered into an interconnection agreement governing such traffic. By Order dated July 30, 2004 (the "Further Order"), the Commission approved, as part of the settlement, separate proposed Traffic Termination Agreements for participating ILECs with under 15,000 access lines and those with over 15,000 access lines. At the request of the Settlement Parties, the Further Order also vacated the Declaratory Order as it applied to the participating CMRS carriers, and stayed said Order with regard to non-participating CMRS carriers. The Further Order specified:

> "Participating ILECs may seek a partial lifting of this Stay as to the application of their tariffs to the indirect intraMTA traffic of any CMRS carrier that is not a participating wireless carrier and that

---

Company, Inc.; Roanoke Telephone Company, Inc.; Union Springs Telephone Company; and Valley Telephone Company.
[2] AT&T Wireless Services, Inc.; BellSouth Mobility, LLC, d/b/a Cingular Wireless; CELCO PARTNERSHIP, d/b/a VERIZON WIRELESS; and Sprintcom, Inc.; and Sprint Spectrum, LP, d/b/a Sprint PCS.
[3] A list of the applicable tariff provisions of each ILEC were attached to the Declaratory Order as Appendix "B."

DOCKET 28988 - #3

> terminates indirect intraMTA traffic to a participating ILEC or
> ILECs without having entered into the pertinent form of traffic
> termination agreement attached as Appendix "B" or "C," as the
> case may be, to this Order or an interconnection agreement with
> the affected ILEC or ILECs."[4]

Pursuant to Joint Petition filed on or about August 22, 2005, a different group of ILECs (the "petitioning ILECs")[5] requested that the Commission partially lift the Stay of its January 26, 2004 Order to affirm the application of the tariffs of the petitioning ILECs to CMRS traffic originated by T-Mobile USA, Inc. ("T-Mobile") and its affiliates which is transported to the ILECs for termination pursuant to a meet point billing agreement between T-Mobile and BellSouth. The ILECs submitting the August 22, 2005 Petition contended that T-Mobile and BellSouth had reached an agreement to move to meet point billing arrangements in 2004. As a result, the petitioning ILECs asserted that BellSouth had terminated payments to said ILECs for their role in terminating indirect IntraMTA mobile-to-land traffic from T-Mobile.

The petitioning ILECs further asserted that they were not party to the meet point billing agreement between BellSouth and T-Mobile and were not involved in the negotiations leading up to that agreement. The petitioning ILECs further noted that T-Mobile had not executed the Traffic Termination Agreements referenced in the Further Order with the ILECs nor had it otherwise remitted payments under applicable tariffs for its indirect IntraMTA mobile-to-land traffic terminated by the petitioning ILECs.

---

[4] See Further Order at p. 3.

[5] Ardmore Telephone Company, Inc.; Blountsville Telephone Company; Brindlee Mountain Telephone Company; Castleberry Telephone Company, Inc.; Farmers Telephone Cooperative, Inc.; GTC, Inc., d/b/a GT Com; Graceba Total Communications, Inc.; Hayneville Telephone Company, Inc.; Hopper Telecommunications Company, Inc.; Interstate Telephone Company; Millry Telephone Company, Inc.; Mon-Cre Telephone Cooperative, Inc.; Moundville Telephone Company, Inc.; National Telephone of Alabama, Inc.; New Hope Telephone Cooperative, Inc.; Otelco Telephone, LLC. (formerly Oneonta Telephone Company, Inc.); Pine Belt Telephone Company, Inc.; Ragland Telephone Company, Inc.; Roanoke Telephone Company, Inc.; Union Springs Telephone Company; Valley Telephone Company.

DOCKET 28988 - #4

The petitioning ILECs further noted that in response to a petition by T-Mobile, the FCC had recently upheld the right of ILECs to apply state tariffs to terminating wireless traffic for charges accruing prior to April 30, 2005.[6]  The petitioning ILECs accordingly sought application of their respective tariff provisions governing mobile-to-land traffic to the T-Mobile indirect IntraMTA mobile-to-land traffic terminated by said ILECs from the date of T-Mobile's meet point billing conversion with BellSouth through April 29, 2005.  The ILECs further reserved all rights under federal and state law regarding such traffic terminated after April 29, 2005.

On or about September 30, 2005, counsel for T-Mobile submitted a Notice of Appearance in Opposition to the ILEC Motion of August 22, 2005.  Counsel for T-Mobile requested in said Motion an extension of time to allow for the preparation of a detailed opposition to the August 22, 2005 Motion of the ILECs.  The Commission accordingly entered an Order Granting Extension on October 14, 2005.  Said Order directed T-Mobile to submit its Response to the ILEC motion on or before October 24, 2005.

Counsel for T-Mobile did not, however, submit responsive pleadings by the established deadline of October 24, 2005.  The Commission accordingly voted to approve the petitioning ILECs' Motion to Lift Stay at its November 1, 2005 meeting.  Following the Commission's November 1, 2005 meeting, but prior to the entry of an order reflecting the aforementioned vote, it was brought to the attention of the Commission that counsel for T-Mobile had unsuccessfully attempted to electronically file a Brief in Opposition to the ILEC Motion to Lift Stay on October 31, 2005.  Said brief was not properly filed with the Commission until November 1, 2005, however, and did not come to the attention of the Commission until after its vote of that same date on the petitioning ILECs' Motion.

---

[6] *Developing a Unified Intercarrier Compensation Regime; T-Mobile, et al, Petition for Declaratory Ruling Regarding Incumbent LEC Wireless Termination Tariffs*; Declaratory Ruling and Report and Order, 20 FCC, Rcd. 48-55 (2005)

DOCKET 28988 - #5

In a Motion to Set Aside or Reconsider Grant of ILECs' Motion to Lift Stay that was filed with the Commission on November 9, 2005, counsel for T-Mobile reported that the Commission's Order of October 14, 2005 which established the deadline of October 24, 2005 for the filing of T-Mobile's response to the ILEC Motion to Lift Stay did not reach him due to a service deficiency.    Counsel for T-Mobile represented that without the benefit of that October 14, 2005 Order of the Commission, he had operated under the premise that a response would be timely if filed on or about October 31, 2005.  Upon learning that the Commission had, on November 1, 2005, voted to grant the ILEC Motion to Lift Stay, counsel for T-Mobile represented that he filed the November 9, 2005 Motion to Set Aside or Reconsider on T-Mobile's behalf.[7]

In both the November 1, 2005 Brief in Opposition and the November 9, 2005 Motion to Set Aside or Reconsider, T-Mobile argued that the ILEC Petition should have been denied because the ILECs had considerably overstated the holding of the Commission's January 26, 2004 Order and mischaracterized the effect of the FCC's Order of February 24, 2005.    T-Mobile asserted that the FCC order in question and the amended regulations adopted therein made clear the FCC's "preference for contractual arrangements by prohibiting ILECs from imposing compensation obligations for non-access CMRS traffic pursuant to tariff."[8]    According to T-Mobile, the FCC explicitly ruled that "existing wireless termination tariffs shall no longer apply upon the effective date of the amendments" adopted.[9]

---

(the "FCC Order").
[7] T-Mobile Motion to Set Aside or Reconsider at pp. 1-2.
[8] *Id.* at pp. 3-4. *citing* FCC Order at ¶9.
[9] *Id.*

DOCKET 28988 - #6

T-Mobile further noted that the FCC's amended regulations clarified that an "incumbent ILEC may … invoke the negotiation and/or arbitration procedure set forth in §252 of the Act."[10]

T-Mobile thus asserted that the aforementioned intervening actions of the FCC had prohibited the use of, or reliance on, state tariffs with respect to CMRS traffic and empowered the ILECs with the explicit legal authority to compel negotiation and/or arbitration regarding compensation for CMRS traffic.[11]  T-Mobile accordingly argued that to now grant the petitioning ILECs' Motion to Lift Stay and enforce the ILEC tariffs against T-Mobile without following the negotiation and/or arbitration process required by the Telecom Act would be contrary to federal law.[12]

T-Mobile further represented that on or about October 24, 2005, the petitioning ILECs began informal discussions with T-Mobile concerning compensation for the termination of CMRS traffic.  T-Mobile maintained that it had expressed its willingness during the course of those negotiations to compensate the petitioning ILECs for historical CMRS traffic and had asked the petitioning ILECs for minutes of use and other billing information necessary to settle the ILEC claims.    T-Mobile asserted, however, that the petitioning ILECs inexplicably abandoned any further meaningful discussions with T-Mobile and filed the instant Motion to Lift the Stay without informing T-Mobile of the amounts they seek for historical CMRS traffic. T-Mobile nonetheless represented that it stood ready to pay the appropriate amount due each petitioning ILEC for historical CMRS traffic after an opportunity to review properly documented and validated invoices and minute of use information from said ILECs.[13]

---

[10] *Id.* at p. 4, *citing* FCC Order at ¶9 and 47 CFR §20.11(e).
[11] *Id.*
[12] *Id.*
[13] *Id.* at p. 5.

DOCKET 28988 - #7

In conclusion, T-Mobile argued that the Commission should have dismissed the ILEC Motion for Stay because it was both unnecessary and legally unfounded. In the alternative, T-Mobile argued that the Commission should have ordered the petitioning ILECs to provide T-Mobile the minute of use information and/or invoices necessary to enable T-Mobile to validate and determine what amount each respective ILEC is entitled to for historical CMRS traffic.[14]

On November 18, 2005, the petitioning ILECs submitted a response to T-Mobile's Motion to Set Aside or Reconsider. In said response, the petitioning ILECs noted that T-Mobile's in-house legal director was informed by email on August 19, 2005 that the ILECs would be filing the Motion to Lift Stay. Despite being immediately served with a copy of said Motion, the petitioning ILECS noted that T-Mobile chose not to make an initial appearance in this matter until September 29, 2005, some 38 days after the Motion to Lift Stay was filed and then only to request "an extension of time ... to prepare and file a more detailed opposition to the ILECs' Petition."[15] Put simply, the petitioning ILECs argued that T-Mobile did not have counsel file an appearance in this matter until a responsive pleading would have been 8 days past due pursuant to the APSC's *Rules of Practice*.[16]

In addition to being untimely, the petitioning ILECs further asserted that T-Mobile's response inappropriately sought to collaterally attack the settled findings set forth in the Commission's Declaratory Order. The ILECs pointed out that the Declaratory Order was widely disseminated and discussed in the wireless industry and was indeed cited by T-Mobile in filings at the FCC immediately after its issuance. Despite T-Mobile's familiarity with the requirements of the Commission's Declaratory Order, the petitioning ILECs pointed out that T-Mobile

---

[14] *Id.*
[15] ILEC Response at p. 2.
[16] *Id., citing* Rule 11(A) of the Commission's *Rules of Practice*.

DOCKET 28988 - #8

nonetheless moved to a meet point billing arrangement with BellSouth in July 2004 without notifying the subtending rural ILECs.[17]

The petitioning ILECs further disputed T-Mobile's claim that it had unsuccessfully sought information regarding the ILECs' minute of use and that the ILECs had refused to report that data. The petitioning ILECs represented that they had previously provided T-Mobile with historic minute of use information as part of their unsuccessful effort to implement the same settlement adopted by other wireless carriers in response to the Commission's Declaratory Order. The petitioning ILECs asserted that if T-Mobile truly had a willingness to compensate the ILECs for the historical CMRS traffic at issue, T-Mobile would not be seeking to set aside the Commission's Order requiring such compensation.[18]

The petitioning ILECs further asserted that T-Mobile's claim that the Commission should reverse the prior decision set forth in its Declaratory Order because of changed circumstances resulting from the FCC's February 24, 2005 order establishing new rules and regulations regarding compensation for indirect CMRS traffic was clearly in error. The petitioning ILECs pointed out that their Motion to Lift Stay merely sought application of their tariffed rates to T-Mobile's indirect IntraMTA mobile-to-land traffic only for the period through April 29, 2005, the day prior to the April 30, 2005 effective date of the FCC's revised rules. The petitioning ILECs represented that T-Mobile was fully aware that if the Commission reversed its previous decision in that regard, the ILECs would have no means of being compensated for the historic traffic at issue.[19]

In conclusion, the petitioning ILECs asserted that the FCC had in fact upheld the ruling entered by the Commission in its Declaratory Order through April 29, 2005. The ILECs thus

---

[17] *Id.* at p. 3.
[18] *Id.* at p. 4.

DOCKET 28988 - #9

argued that they should not be required to incur additional delay and costs in implementing the Commission's Declaratory Order for a carrier that chose to enter into a meet point billing agreement with BellSouth without having the required arrangements in place with other ILECs.[20] The petitioning ILECs thus asserted that T-Mobile's Motion was due to be denied.[21]

On December 1, 2005, T-Mobile filed a Reply to the petitioning ILECs' Response. T-Mobile reasserted therein that it stood ready to address the historic CMRS traffic at issue with the petitioning ILECs.[22] T-Mobile also reiterated its argument that the petitioning ILECs' Motion to Lift Stay should not have been granted by the Commission because said Motion was both unnecessary and legally unfounded. T-Mobile thus urged the Commission to set aside its November 1, 2005, vote to grant that Stay, or in the alternative, to issue an order requiring the petitioning ILECs to provide T-Mobile with the minute of use information and invoices necessary to enable T-Mobile to validate and determine what amount each ILEC is entitled to for the historical CMRS traffic at issue.

## II.    FINDINGS AND CONCLUSIONS

Our assessment of the matters at issue in this cause necessarily begin with a thorough review of the February 24, 2005 FCC order cited by the parties. At the outset, we note that the FCC order in question was entered in response to the petition of a coalition of wireless carriers that included T-Mobile for a finding that state wireless termination tariffs filed by local exchange carriers were illegal. In denying that petition, the FCC held that its then existing rules did not "explicitly preclude tariffed compensation arrangements" and that CMRS providers "were obligated to accept the terms of applicable state tariffs" with respect to indirect IntraMTA traffic

---

[19] *Id.*
[20] *Id.* at pp. 4-5.
[21] *Id.*
[22] T-Mobile Reply at p.1.

DOCKET 28988 - #10

such as that at issue in this proceeding.[23]  Although the FCC did amend its rules to prohibit the future applicability of such tariffs in favor of agreements negotiated pursuant to the provisions of the Telecommunications Act of 1996, the FCC clearly upheld the validity and enforceability of state tariffs governing indirect IntraMTA traffic up until the April 30, 2005 effective date of its newly revised rules requiring negotiated agreements regarding the traffic in question.  The FCC deemed such negotiated agreements to be more consistent with the pro-competitive process and policies of the Telecommunications Act of 1996.[24]

In order to facilitate the transition to negotiated agreements for the traffic at issue, the FCC adopted rules compelling wireless providers to, upon request, negotiate interconnection agreements with ILECs in good faith and submit to arbitration by state commissions as required by §252 of the Telecommunications Act of 1996.[25]  The FCC deemed the new rule necessary because it determined that ILECs had experienced difficulty collecting compensation from wireless providers due to the fact that ILECs could not compel CMRS providers to negotiate interconnection agreements or submit to arbitration under §252 of the Telecommunications Act of 1996 absent such a rule.[26]

We find that the foregoing conclusions of the FCC only strengthen our previous vote to grant the petitioning ILECs' Motion to Lift Stay.  The petitioning ILECs' Motion is predicated on the conclusions reached by the Commission in our January 26, 2004 Declaratory Order as well as our Further Order of July 30, 2004.  The FCC's order strongly affirms the findings and conclusions we reached in those Orders as well as the rationale relied upon in rendering the determinations set forth therein.  As the petitioning ILECs' Motion to Lift Stay only seeks to

---

[23] FCC Order *at* ¶9.
[24] *Id.* at ¶14.
[25] *Id.* at ¶16.
[26] *Id.* at ¶15.

DOCKET 28988 - #11

address compensation for historical CMRS traffic that was terminated up to the April 30, 2005 effective date of the FCC's new rules, we find a grant of said Motion to be entirely appropriate and consistent with the order of the FCC. We accordingly reject T-Mobile's argument that a grant of the petitioning ILECs' Motion and the ensuing enforcement of the applicable state tariff provisions of the petitioning ILECs to the historical CMRS traffic at issue without following the negotiation and/or arbitration process required by the Telecommunications Act of 1996 would be contrary to federal law.

The practical result of our decision herein is that T-Mobile must compensate the petitioning ILECs in accordance with the applicable tariff provisions for all T-Mobile indirect, intraMTA mobile-to-land traffic terminated by the ILECs from the date of T-Mobile's meet point billing conversion with BellSouth through April 29, 2005. In order to facilitate such payment, the petitioning ILECs shall submit to T-Mobile all minute of use and other billing information that is necessary for T-Mobile to calculate the amounts it is responsible for as soon as practicable. T-Mobile shall submit the amounts due the petitioning ILECs as soon as practicable after receiving the information necessary to calculate the amount of the payments in question.

With respect to T-Mobile's indirect, IntraMTA mobile-to-land traffic terminated by the ILECs from April 30, 2005 forward, the parties are encouraged to reach negotiated settlements and/or interconnection agreements as envisioned by the FCC. The parties may seek mediation and/or arbitration before the Commission in the event that those efforts are unsuccessful.

Based on the reasoning set forth above, we conclude that our foregoing findings and conclusions are consistent with prevailing law. We further conclude that the public convenience and necessity will be served by the entry of this order.

DOCKET 28988 - #12

IT IS SO ORDERED BY THE COMMISSION.

IT IS FURTHER ORDERED BY THE COMMISSION, That jurisdiction in this cause is hereby retained for the issuance of any further order or orders as may appear to be just and reasonable in the premise.

IT IS FURTHER ORDERED BY THE COMMISSION, That jurisdiction in this cause is hereby retained for the issuance of any further order or orders as may appear to be just and reasonable in the premises.

IT IS FURTHER ORDERED, That this Order shall be effective as of the date hereof.

DONE at Montgomery, Alabama, this _24th_ day of February, 2006.

ALABAMA PUBLIC SERVICE COMMISSION

Jim Sullivan, President

Jan Cook, Commissioner

George C. Wallace, Jr., Commissioner

ATTEST: A True Copy

Walter L. Thomas, Jr., Secretary